**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JEAN MARIE MOSS,<br><br>     Plaintiff,<br><br><br>          v.<br><br><br>CARLA HAYDEN, LIBRARIAN,<br>LIBRARY OF CONGRESS,<br><br>     Defendant. | Civil Action No. 18-470 (JEB) |

<u>**MEMORANDUM OPINION**</u>

Plaintiff Jean Moss, who has been employed by the Library of Congress since 2009, alleges in this suit that the Library discriminated and retaliated against her.  Chiefly, she claims that her non-selection for a promotion was based on her race, gender, age, and disability in violation of Title VII, the Age Discrimination in Employment Act, and the Rehabilitation Act. She also alleges that after she filed an Equal Employment Opportunity complaint following such non-selection, the Library engaged in several other discrete discriminatory and retaliatory actions against her.  Moss further alleges that she was subjected to a hostile workplace.  Defendant now moves for summary judgment on all counts, contending that no reasonable jury could find that Plaintiff suffered discrimination or retaliation in regard to any of these incidents.  The Court, persuaded by the Library's arguments, will grant the Motion in full.

**I.    Background**

    **A.    <u>Factual Background</u>**

As this is a question of summary judgment, the facts will be construed in the light most favorable to Plaintiff.  <u>See</u> <u>Talavera v. Shah</u>, 638 F.3d 303, 308 (D.C. Cir. 2011).  Although more

details about the specific incidents underlying Plaintiff's claims appear in the Analysis, *infra*

Section III, the Court presents the general background here.

Moss is a black woman who was born in 1963.  See ECF No. 26-1 (Pl. Resp. SMF), ¶ 1.

Since roughly 2000, she has had Spasmodic Dysphonia, a medical condition that causes her to

experience periods of vocal instability and breathlessness.  Id., ¶ 2.  From approximately 2009 to

July 2017, Plaintiff was employed at the Library as a Special Assistant in her particular

directorate, a GS-14 position.  Id., ¶ 4.  Since March 2016, she reported to Eugene Flanagan,

Director of National Programs, Senior Level, National and International Outreach, as her first-

level supervisor.  Id., ¶¶ 5, 9.  Jane McAuliffe, Director of NIO, Senior Level, served as her

second-level supervisor.  Id., ¶ 10.

In December 2016, Plaintiff interviewed for a vacant GS-15 position as Supervisory

Strategic Programs Coordinator.  See ECF No. 24-6 (MSJ, Exh. 1, Pt. 1) at ECF p. 20.  The

SSPC is responsible for the "strategic organizational oversight" of several of the Library's

programs, including the National Book Fair (NBF), the Gershwin Prize, the Poet Laureateship,

and the Literacy Awards.  See Pl. Resp. SMF, ¶ 23.  Moss was not selected for the position, see

id., ¶ 46, which instead went to Jarrod MacNeil, a white man who is younger than she.  Id., ¶ 29.

On February 6, 2017, Moss met with an EEO Specialist "to discuss filing an EEO

complaint regarding her non-selection."  MSJ, Exh. 1, Pt. 1 at ECF p. 3.  Four days later, she

notified Flanagan that she was pursuing an EEO action for discrimination, and on February 17,

she filed an informal complaint.  Id.  On May 26, Plaintiff filed a formal EEO complaint, which

she revised on June 22 to include additional incidents.  Id. at ECF pp. 31–32.

Her situation did not improve after her non-selection and EEO activity.  For instance,

Moss expressed to her supervisor that she did not want to continue performing duties for the

Library's signature NBF event without additional compensation, believing that such duties were "specifically detailed in the GS-15 position [for which she was not selected], and therefore should be done by the selected candidate." Id. at ECF p. 37. Her supervisors, however, insisted that she continue this work, which she had been performing since September 2014, without additional remuneration. Id. at ECF pp. 37–38; ECF No. 31-1 (Def. Reply to Pl. SMF), ¶¶ 2, 5, 19. On February 23, 2017, Moss received a counseling memo codifying these directives and threatening disciplinary actions, including possible termination if she refused to complete the assignments as instructed. See Pl. Resp. SMF, ¶ 61; MSJ, Exh. 1, Pt. 1 at ECF pp. 67–69. Additionally, on April 17, 2017, she requested that her supervisor sign a memorandum she had drafted "requesting a desk audit to review and properly classify [her] work, position description, and commensurate pay." ECF No. 26-9 (Pl. Opp., Exh. E) at ECF pp. 4–5. In other words, Moss requested an evaluation to determine her eligibility for a promotion based on the extra duties she was performing. Her supervisor refused to sign it. See Pl. Resp. SMF, ¶¶ 79–80, 82.

She complains of several other incidents in the months following, which are described in detail below. The treatment Moss alleges here ultimately came to an end after she was detailed to the National Digital Initiatives program effective July 1, 2017, and subsequently promoted in October 2017 to Senior Advisor, a GS-15 position in the Library's Copyright Office. Id., ¶¶ 98, 103.

B.    Procedural Background

As a result of the aforementioned incidents, Plaintiff filed suit in this Court on September 20, 2019. She alleges that Defendant illegally discriminated against her in violation of Title VII, the ADEA, and the Rehabilitation Act by not selecting her for the SSPC position. See ECF No. 1 (Compl.), ¶¶ 57, 74, 110–13, 126. She further asserts that the Library discriminated against her

in violation of Title VII and the ADEA by requiring her to perform NBF-related work without additional pay and through her supervisor's refusal to sign her self-drafted desk audit.  Id., ¶¶ 50, 57, 74, 126.  She also claims that the Library's continued denials of compensation for her performance of the NBF-related work, its issuance of the February 23 counseling memo, and the desk-audit incident constituted retaliation in violation of Title VII, the ADEA, and the Rehabilitation Act.  Id., ¶¶ 43, 49, 94–96.  Finally, she alleges that Defendant created a hostile work environment in violation of the same statutes.  Id., ¶¶ 52, 90, 94–96, 99.  On April 2, 2020, Defendant moved for summary judgment on all claims.

## II.    Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Liberty

Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v.

Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*).  On a motion for summary

judgment, the Court must "eschew making credibility determinations or weighing the evidence."

Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere

unsupported allegations or denials and must be supported by affidavits, declarations, or other

competent evidence, setting forth specific facts showing that there is a genuine issue for trial.

See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The nonmovant is

required to provide evidence that would permit a reasonable jury to find in its favor.  See

Laningham v. Navy, 813 F.2d 1236, 1241–42 (D.C. Cir. 1987).  In light of this requirement, and

pursuant to Local Civil Rule 7(h) and Federal Rule 56(c), the Court, in resolving summary-

judgment motions, "assume[s] that facts identified by the moving party in the statement of

material facts are admitted, unless such a fact is controverted in the statement of genuine issues

filed in opposition to the motion."  Local Civ. R. 7(h)(1).

## III.    Analysis

### A.    Legal Framework

Plaintiff asserts five causes of action under three statutes: Title VII, the Rehabilitation

Act, and the Age Discrimination in Employment Act.  See Compl. at 9, 12, 15, 18, 20.  Title VII

makes it unlawful for employers "to discriminate against any individual with respect to [her]

compensation, terms, conditions, or privileges of employment, because of such individual's race,

color, religion, [or] sex."  42 U.S.C. § 2000e–2(a)(1).  The Rehabilitation Act prohibits

discrimination against an employee on the basis of disability, see 29 U.S.C. § 794(a), and the

ADEA prohibits the same on the basis of age.  See 29 U.S.C. § 623(a).  The ADEA applies to

individuals 40 years of age and older.  Id. § 631(a).  All three statutes forbid retaliation against

employees who engage in protected EEO activity.  See 42 U.S.C. § 2000e–3(a) (Title VII); 29

U.S.C. § 623(d) (ADEA); 29 U.S.C. § 794(d); Mogenhan v. Napolitano, 613 F.3d 1162, 1165

(D.C. Cir. 2010) (applying ADA's anti-retaliation provision to Rehabilitation Act).

 In weighing a discrimination or retaliation claim under any of these laws, the Court must

follow the three-part burden-shifting framework set forth in McDonnell Douglas Corp. v. Green,

411 U.S. 792, 802–05 (1973).  See Ford v. Mabus, 629 F.3d 198, 201 (D.C. Cir. 2010) (applying

framework to ADEA claims); Stoe v. Barr, 960 F.3d 627, 639 (D.C. Cir. 2020) (applying

framework to Title VII claims); Webster v. U.S. Dep't of Energy, 267 F. Supp. 3d 246, 259

(D.D.C. 2017) (applying framework to Rehabilitation Act claims).  Under that familiar

framework, the plaintiff must first establish a *prima facie* case of discrimination or retaliation.

See McDonnell Douglas, 411 U.S. at 802 (applying framework to discrimination claim); see also

Durant v. Dist. of Columbia Gov't, 875 F.3d 685, 696–97 (D.C. Cir. 2017) (applying framework

to retaliation claim).  To clear that hurdle, she need only show that "(1) she is a member of a

protected class" or, in the retaliation context, that she "engaged in statutorily protected activity";

"(2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an

inference of discrimination" or, in the case of retaliation, "that a causal link connects the

[protected activity and the adverse action]."  Czekalski, 475 F.3d at 364 (internal quotation

marks and citation omitted); Jones v. Bernanke, 557 F.3d 670, 677 (D.C. Cir. 2009).

 For discrimination claims, a defendant may rebut a plaintiff's *prima facie* showing with

evidence of a "legitimate, nondiscriminatory reason" for its action.  Stoe, 960 F.3d at 639

(quoting Holcomb, 433 F.3d at 896).  Once a defendant has produced such evidence, "the

presumption of discrimination 'simply drops out of the picture.'"  Holcomb, 433 F.3d at 896

(quoting Burke v. Gould, 286 F.3d 513, 520 (D.C. Cir. 2002)).  The burden then shifts back to the plaintiff, who must show that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (quoting Tex. Dep't of Cmty Affairs v. Burdine, 450 U.S. 248, 253 (1981)).

For retaliation claims, similarly, the defendant's rebuttal may take the form of a "non-retaliatory explanation" for its action.  See Jones, 557 F.3d at 678.  Once "the employer [proffers a legitimate, non-retaliatory reason], 'the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer . . . retaliation from all the evidence,' [including] not only the prima facie case but also the evidence the plaintiff offers to 'attack the employer's proffered explanation for its action' and other evidence of retaliation."  Id. at 677 (quoting Carter v. George Washington Univ., 387 F.3d 872, 878 (D.C. Cir. 2004)).

In considering Defendant's Motion for Summary Judgment, the Court will first address the heart of the suit — namely, Moss's non-selection claim.  It will next turn to her remaining claims of discrimination and retaliation: the NBF work assignments, the counseling memo, and the desk audit.  It concludes by analyzing her hostile-work-environment allegation.

B.    Non-Selection

In 2016, Defendant posted a vacancy announcement for a Supervisory Strategic Programs Coordinator, a GS-15 position.  See Pl. Resp. SMF, ¶ 21.  A selection panel, consisting of Jane McAuliffe, Eugene Flanagan, and Director of Special Events and Public Programs Mary Eno, conducted interviews for the position.  Id., ¶ 30; MSJ, Exh. 1, Pt. 1 at ECF p. 4.  The panel interviewed eight candidates including Plaintiff and Jarrod MacNeil.  See ECF No. 24-8 (MSJ,

Exh. 1, Pt. 3) at ECF p. 38.  All interviewees faced the same questions about their knowledge, skills, and abilities (KSAs) for the position, and the panelists scored them based on their responses.  See ECF No. 24-7 (MSJ, Exh. 1, Pt. 2) at ECF p. 39; see also MSJ, Exh. 1, Pt. 3 at ECF pp. 36–37.  MacNeil received a score of 3.3 out of a possible 4.0, while Moss received a final interview score of 2.3, placing her in the bottom half of interviewees.  See MSJ, Exh. 1, Pt. 3 at ECF p. 38.  Only one applicant — who withdrew from consideration — scored higher than MacNeil did.  Id.  MacNeil, who is white and under the age of 40, was ultimately selected.  See MSJ, Exh. 1, Pt. 1 at ECF p. 4; ECF No. 24-2 (Def. SMF), ¶ 46.

In seeking summary judgment, Defendant contends that Moss was not chosen because she was less qualified for the role than MacNeil, while Plaintiff rejoins that the interviewers' conduct, coupled with a comparison of her and MacNeil's qualifications, reveals her non-selection to be a product of discrimination on the basis of her gender, race, age, and disability.  See ECF No. 24-1 (MSJ) at 10; Compl., ¶¶ 37, 57, 74, 110, 126; see also Def. SMF, ¶¶ 47–48.

   1.   Prima Facie *Case of Discrimination*

To establish a *prima facie* case of discriminatory non-selection in this Circuit, Plaintiff must show that "(1) she is a member of a protected class; (2) she applied for and was qualified for an available position; (3) despite her qualifications, she was rejected; and (4) either someone filled the position or it remained vacant and the employer continued to seek applicants."  Stoe, 960 F.3d at 639 (quoting Holcomb, 433 F.3d at 895).  Moss easily clears this bar because (1) she is a black woman over forty who suffers from Spasmodic Dysphonia; (2) she applied for the SSPC position, and Defendant concedes that she was qualified; (3) she was not selected; and (4) the position was filled by MacNeil.  See Pl. Resp. SMF, ¶¶ 1–2, 46; MSJ, Exh. 1, Pt. 2 at ECF p. 49.  The Court, accordingly, proceeds to the next step of the McDonnell Douglas analysis.

2.      *Legitimate, Non-Discriminatory Explanation*

The Library explains that Moss was not selected because she did not possess the "best qualifications[,] . . . including in the knowledge, skills, and abilities (KSAs) considered most critical for the position."  MSJ at ECF p. 8.  In assessing whether this is a legitimate, non-discriminatory reason for its decision, the Court considers four factors: (1) whether the employer produced evidence that would be admissible at the summary-judgment phase; (2) whether the factfinder could reasonably find that the employer's action was motivated by a non-discriminatory reason; (3) whether the employer's justification is facially credible in light of proffered evidence; and (4) whether the employer's evidence is sufficiently clear and specific that it is capable of being attacked by the plaintiff as pretextual.  See Figueroa v. Pompeo, 923 F.3d 1078, 1087–88 (D.C. Cir. 2019).

Here, Defendant checks all the boxes.  First, it produced evidence that may be considered at summary judgment.  The Library provided a copy of the announcement for the Supervisory Strategic Programs Coordinator position, as well as the resumes of Plaintiff and MacNeil.  See MSJ, Exh. 1, Pt. 3 at ECF pp. 8–14, 23–24, 34–35.  It also submitted affidavits from all three individuals on the hiring panel.  See MSJ, Exh. 1, Pt. 2 at ECF pp. 36-43, 46–60.  Finally, Defendant produced the interview-rating forms completed during the interviews.  See MSJ, Exh. 1, Pt. 3 at ECF pp. 36–37.  Moss does not contest the admissibility of this evidence.

Second, a factfinder who credits such evidence could reasonably determine that the Library's action was motivated by a non-discriminatory reason — specifically, that Plaintiff was not selected because she was "not among the highest-scoring candidates eligible for the vacant . . . position."  Albert v. Perdue, No. 17-1572, 2019 WL 4575526, at *4 (D.D.C. 2019); see also Fischbach v. D.C. Dep't of Corrs., 86 F.3d 1180, 1182 (D.C. Cir. 1996) (finding

employer's choice of one of two candidates "based solely upon their answers during the interview, as reflected in the score that the interview panel assigned to each applicant" was a sufficient non-discriminatory explanation). Indeed, Plaintiff admits that five interviewees, including MacNeil, received higher scores than she did. See Pl. Resp. SMF, ¶ 43.

Third, Defendant's non-discriminatory justification is "facially 'credible' in light of the proffered evidence." Figueroa, 923 F.3d at 1088 (quoting Bishopp v. Dist. of Columbia, 788 F.2d 781, 788–89 (D.C. Cir. 1986)). The selection committee offered the position to the highest-scoring interviewee, excluding one who withdrew from consideration. See Pl. Resp. SMF, ¶¶ 43, 44; MSJ, Exh. 1, Pt. 3 at ECF p. 38. Plaintiff, by contrast, received one of the lowest interview scores. Id. The Library's explanation, therefore, appears reasonable on its face. See Figueroa, 923 F.3d at 1088; see also Albert, 2019 WL 4575526, at *4 (noting that difference in interview score between two candidates is legitimate explanation for non-selection).

Fourth, the Library has identified a "clear and reasonably specific" explanation for not selecting Plaintiff for the position. Figueroa, 923 F.3d at 1088 (quoting Segar v. Smith, 738 F.2d 1249, 1269 n.13 (D.C. Cir. 1984)). As in Albert, Defendant set up an interview system with precise rating criteria. See Pl. Resp. SMF, ¶ 42; Albert, 2019 WL 4575526, at *4. The interview panel asked all interviewees the same questions. See MSJ, Exh. 1, Pt. 2 at ECF p. 39; see also MSJ, Exh. 1, Pt. 3 at ECF pp. 5, 36–37. Answers were scored on a five-point scale from zero (lowest) to four (highest). See ECF No. 24-9 (MSJ, Exh. 1, Pt. 4) at ECF p. 13. And the interview-rating forms show that Plaintiff received a final score of 2.3, a full point lower than MacNeil's 3.3. See MSJ, Exh. 1, Pt. 3 at ECF pp. 36–38. Since the rating forms show a "precise breakdown between the . . . candidates," Moss "easily could determine which factors she should challenge at the third prong of the McDonnell Douglas framework." Figueroa, 923 F.3d at 1090.

In other words, Defendant has articulated reasons with sufficient specificity to provide her a

"'full and fair opportunity to attack the' explanation as pretextual." Id. at 1088 (quoting

Lanphear v. Prokop, 703 F.2d 1311, 1316 (D.C. Cir. 1983)).

        3.     *Pretext*

The Motion thus boils down to this: can Plaintiff provide sufficient evidence for a

reasonable jury to conclude that Defendant's qualifications-based explanation for selecting

MacNeil was pretext for discrimination?  See Holcomb, 433 F.3d at 897.  To satisfy this

requirement, Moss endeavors to show that she was more qualified than MacNeil for the position

and, alternatively, that the interview process was unfair.  Neither effort is persuasive.

        a.     Qualifications

While the Court must not serve as a "super-personnel department that re-examines an

entity's business decisions," id. at 897 (quoting Barbour v. Browner, 181 F.3d 1342, 1346 (D.C.

Cir. 1999)), it could possibly "infer discrimination" if Plaintiff is "significantly better qualified

[than the selected candidate] for the job."  Id.

Moss embraces this burden, asserting that she is "head and shoulders" more qualified

than MacNeil for the position because she, unlike him, "is a certified COR [contracting officers'

representative] with proven experience managing annual budgets over $52M and contracts

totaling over $18M."  Compl., ¶¶ 35, 63; see also ECF No. 26 (Pl. Opp.) at 14.  It is true that the

job description states that the selected candidate will "[s]erv[e] as . . . [the COR] in monitoring

vendor/contractor performance."  MSJ, Exh. 1, Pt. 1 at ECF p. 60.  Yet three other qualifications

— "[a]bility to supervise and manage a diverse workforce," "[a]bility to develop vision and

implement a strategic plan for a portfolio of events at a cultural institution," and  "[a]bility to

interact collaboratively with others" — were the ones deemed "most critical for [the] position."

Id. at ECF pp. 60–61, 64.  In other words, COR certification was not <u>necessary</u> "[t]o be considered for final selection."  Id. at ECF p. 64.  In fact, the job description leaves open the possibility that the successful candidate could obtain COR certification <u>after</u> being selected. That the Library selected a candidate without this credential, therefore, is not "inherently indicative" of discrimination.  Holcomb, 433 F.3d at 897.

Plaintiff also asserts that she has professional experience that MacNeil lacks — specifically, that she "possesses over 30 years of experience in personnel, project, financial and contract management," and "is experienced in directing large, complex projects valued from $2M to $19M, with some spanning multiple years."  ECF No. 26-2 (Pl. SMF), ¶ 37.  Although the job description and the scorecard identify "[a]bility to manage financial and contract activities" as <u>a</u> desired qualification, it was just one of eight KSAs evaluated on the interview scorecard.  See MSJ, Exh. 1, Pt. 1 at ECF p. 61; MSJ, Exh. 1, Pt. 3 at ECF pp. 36–37.  While Plaintiff did receive a higher score than MacNeil for this KSA, he scored higher than she on all other KSAs, including the aforementioned three critical ones, as well as "[p]rior background and experience," "[a]bility to lead, plan, coordinate and manage programs and projects," and "[a]bility to communicate effectively other than in writing."  Compare MSJ, Exh. 1, Pt. 3 at ECF p. 36 (Moss scorecard), with id. at ECF p. 37 (MacNeil scorecard).  Plaintiff, in sum, provides no evidence that her credentials, taken together, are on par with those of MacNeil, let alone that they are so superior that a reasonable jury could "infer discrimination."  Holcomb, 433 F.3d at 897.

### b.    Interview Process

Plaintiff next contends that the "interview process was handled unfairly."  Pl. Opp. at 12. In this Circuit, "a plaintiff attacking a qualifications-based explanation is expressly <u>not</u> limited to

comparing her qualifications against those of the successful applicant." Holcomb, 433 F.3d at 897. Rather, she "may seek to expose other flaws in the employer's explanation." Id.

Moss attempts here to cast doubt on whether Defendant took her interview process seriously and legitimately considered her for the position. She asserts that "the selecting officials were not taking any notes or writing down [her] responses during the interview." Pl. Resp. SMF, ¶ 41. The Library, however, has provided the written notes of all three interviewers for all seven of the standardized oral-interview questions, see ECF No. 31-4 (Def. Reply, Exh. 3), after omitting a citation to them in a previous filing. See ECF No. 31 (Def. Reply) at 5 & n.2. As a result, no jury question exists regarding Plaintiff's claim that the interviewers failed to take notes. See Holcomb, 433 F.3d at 897.

Moss also posits that, because one of the panelists arrived ten minutes late, her interview was "cut short[] and rushed." See MSJ, Exh. 1, Pt. 1 at ECF p. 36. She believes that this denied her "a full opportunity to respond to all the interview questions during the interview." Pl. Resp. SMF, ¶ 41. But Moss subsequently concedes that she "answered the questions asked," Pl. Opp. at 12, and she provides no evidence that the shorter interview adversely affected her consideration. The truncated interview, therefore, does not demonstrate a "flaw[]" in Defendant's justification for non-selection. Holcomb, 433 F.3d at 897.

At the end of the day, Plaintiff has not demonstrated that a reasonable jury could find that Defendant's explanation for her non-selection was pretext for discrimination. See Brady v. Office of Sergeant at Arms, 520 F.3d 490, 495 (D.C. Cir. 2008). The Court thus will grant summary judgment to the Library on all four of Moss's non-selection claims.

C.      Other Theories of Discrimination and Retaliation

Although that event is the centerpiece of her suit, Plaintiff raises other allegedly discriminatory and retaliatory actions as well.  The Library discusses myriad incidents in its briefing, but Plaintiff's Complaint and Opposition clearly assert claims regarding only the NBF assignments, the February 23 counseling memo, and the desk-audit request.  See Compl., ¶¶ 50, 57, 74, 94–96, 126.  The Government at summary judgment primarily argues that these incidents do not constitute adverse employment actions sufficient to merit a trial.

All of these claims are also analyzed under the McDonnell Douglas framework.  The Court begins by noting that "'[a]dverse actions' in the retaliation context encompass a broader sweep of actions than those in a pure discrimination claim."  Baloch v. Kempthorne, 550 F.3d 1191, 1198 n.4 (D.C. Cir. 2008) (citing Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53 (2006)).  For a discrimination claim, clearing the adverse-action hurdle requires a plaintiff to show that she endured a "significant change in employment status . . . [and that she] experience[d] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm."  Douglas v. Donovan, 559 F.3d 549, 552 (D.C. Cir. 2009) (internal quotation marks and citations omitted); see also id. (collecting cases).  In the retaliation context, conversely, "an action is adverse if it would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Crowley v. Vilsack, 236 F. Supp. 3d 326, 330 (D.D.C. 2017) (quoting Burlington N., 548 U.S. at 68).  Bearing this in mind, the Court looks at the three incidents separately.

1.    *NBF Assignments*

The NBF annually "brings together best-selling authors and thousands of book fans for author talks, panel discussions, book signings and other activities." Pl. Resp. SMF, ¶ 13 (citation omitted). Convening the NBF is a "huge group undertaking," so many Library employees assist in the event's planning and execution pursuant to the "other duties as assigned" clauses in their position description. See ECF No. 31-2 (Declaration of Eugene Flanagan), ¶¶ 4–5. In September 2014, Plaintiff's former supervisor recruited her to "assist with responsibilities for managing the contracts and financials of the 2015 [NBF]." Def. Reply to Pl. SMF, ¶ 2. Her duties for the 2015 and 2016 NBFs included "serv[ing] as the operational fund manager and COR." See MSJ, Exh. 1, Pt. 2 at ECF pp. 8, 18. More specifically, Moss prepared contracts and contract-funding documents, assisted with vendor relations, tracked project progress, established project plans, and consulted with the Washington Convention Center, the NBF's recent venue. Id. Each annual NBF, moreover, requires advance planning; accordingly, Plaintiff also worked on the 2017 and 2018 NBFs through "early 2017." Id. at ECF p. 8.

Moss alleges that she completed these NBF assignments with an "understanding" that she would be "primarily positioned" for a future role "encompass[ing] these duties." Compl., ¶ 18; Def. Reply. to Pl. SMF, ¶ 4. She did not receive additional pay, however, which became a point of contention after her non-selection for the SSPC position. See Compl., ¶¶ 24–25, 38–42; Pl. Resp. SMF, ¶ 57; see also MSJ, Exh. 1, Pt. 1 at ECF p. 70. Indeed, according to Plaintiff, her NBF assignments amounted to both actionable discrimination and retaliation. See Compl., ¶¶ 57, 94, 126.

a.      Discrimination

Moss has not adequately shown that the NBF assignments constitute an adverse employment action.  "[S]ignificantly different responsibilities" or "a significant change in benefits" must accompany the reassignment to demonstrate an adverse action.  See Forkkio v. Powell, 306 F.3d 1127, 1131 (D.C. Cir. 2002) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)).  As a threshold matter, Moss was not reassigned at all — she was given additional duties, but her position remained the same.  See Pl. Resp. SMF, ¶¶ 17–18; see also MSJ, Exh. 1, Pt. 2 at ECF pp. 4–22.  Nor does Plaintiff claim that her NBF responsibilities resulted in a "significant change in benefits."  Forkkio, 306 F.3d at 1131–32 (finding no adverse action for retaliation or discrimination because no change in pay, no change in GS-15 classification upon reassignment, and no reduction of responsibilities); see also Walker v. Dist. of Columbia, 279 F. Supp. 3d 246, 262 (D.D.C. 2017).  Although she does allege that her NBF duties were "a tremendous amount of additional work," Compl., ¶ 36, "harder work assignments do not constitute an adverse employment action."  Koch v. Schapiro, 759 F. Supp. 2d 67, 74 (D.D.C. 2011).  This Circuit, moreover, has held that being "given additional functions to perform" without reduction of existing "substantive responsibilities" is "not sufficiently significant to amount" to an adverse action.  Forkkio, 306 F.3d at 1131.

Even if Plaintiff could demonstrate that the NBF work somehow did reach that level, she has not shown the requisite "causal nexus between being in a protected class and Defendant's alleged adverse employment action."  Koch, 759 F. Supp. 2d at 75 (citing McDonnell Douglas, 411 U.S. at 802).  In other words, she offers no evidence that her initial assignment to NBF duties in 2014 was in any way a discriminatory act.  She also fails to engage with Defendant's arguments that she was not entitled to extra pay under established LOC policies, a position

16

supported by the testimony of a Library Human Resources Specialist.  See ECF No. 31-6

(Declaration of Latoya Friday).  Specifically, Moss provides no explanation for why the Library

should have departed from its rules that "[t]he quantity of work an employee is assigned does not

correlate with the amount of compensation," and "[e]mployees are not entitled to additional

compensation by performing additional duties without requesting a desk audit or an accretion of

duties being performed."  Id., ¶¶ 3, 5.

Because Plaintiff has not made a *prima facie* showing of discrimination, the Court will

grant summary judgment with respect to this claim.

> b.    Retaliation

Plaintiff's retaliation cause of action related to this additional NBF work also sinks

because it rests on a faulty foundation.  As a refresher, Moss first took up these NBF assignments

in September 2014 — at least 28 months before her earliest EEO activity in February 2017.  See

Def. Reply to Pl. SMF, ¶¶ 2, 22; Compl., ¶¶ 17, 29; see also MSJ, Exh. 1, Pt. 1 at ECF p. 40.

Since the "alleged retaliatory act[] predate[s] the relevant protected EEO activity," the NBF

assignments cannot constitute a *prima facie* case of retaliation.  Hayslett v. Perry, 332 F. Supp.

2d 93, 98 (D.D.C. 2004); see also Manus v. Hayden, No. 18-1146, 2020 WL 2615529, at * 11

(D.D.C. May 23, 2020) (same) (citing Watkins v. Texas Dep't of Criminal Justice, 269 F. App'x

457, 461 (5th Cir. 2008)); Martin v. Dist. of Columbia, 78 F. Supp. 3d 279, 316 (D.D.C. 2015)

(same).

To the extent Moss is claiming that she undertook further duties in 2017, see Compl.,

¶ 43; Pl. Opp. at 27–28, the Court reaches the same conclusion regarding the adverse-action

requirement as it did in connection with her discrimination claims.  Put another way, Moss

provides no evidence — nor does she argue — that "[t]his workload was objectively

unreasonable." See Kangethe v. Dist. of Columbia, No. 18-64, 2019 WL 266329, at *6 (D.D.C.

Jan. 18, 2019); see also Walker, 279 F. Supp. 3d at 267 (finding that "heavier work

responsibilities" were not adverse action for retaliation claim).

2.    <em>Counseling Memo</em>

Plaintiff next alleges that Flanagan's "issuance of a counseling memo," Pl. Opp. at 29, on

February 23, 2017, amounts to actionable retaliation. Id. at 2, 25–26, 28–29. The memorandum,

written in compliance with Library procedures, summarized a discussion between Flanagan and

Moss that took place on February 7, 2017. See MSJ, Exh. 1, Pt. 1 at ECF pp. 67–68; MSJ, Exh.

1, Pt. 2 at 50–51; see also ECF No. 24-16 (Declaration of April Haskins). It also "outline[d]

[Flanagan's] instructions regarding [Plaintiff's] performance and conduct," MSJ, Exh. 1, Pt. 1, at

ECF p. 67, and included language advising her that a "failure to comply with [Flanagan's]

instructions may result in disciplinary action, up to and including removal from the Library." Id.

at ECF p. 68.

Moss argues that the memo was adverse because it threatened possible discipline and

termination. See Pl. Opp. at 26. She alleges that the temporal proximity between her EEO

activity earlier in February and the memo's issuance that same month creates an "unmistakable"

inference of causation. Id. at 25–26. Defendant responds that "[t]his memorandum and

counseling fail to qualify as materially adverse actions" because they constituted only informal

counseling. See MSJ at 14–15. The Library explains that the memo's language mentioning

possible removal "is standard language used in every Library counseling memorandum and is

not intended as a threat." Id. at 15. Finally, Defendant offers a "legitimate, nondiscriminatory,

non-retaliatory reason for issuing" the memo, citing Moss's unsatisfactory performance

following her non-selection. Id. at 15–16.

Plaintiff offers no reason to depart from the general rule "in the D.C. Circuit [that] counseling letters . . . do not constitute adverse employment actions, even under the more permissive standard . . . for retaliation claims." Bowe-Connor v. Shinseki, 845 F. Supp. 2d 77, 92–93 (D.D.C. 2012) (collecting cases). This rule, moreover, is especially applicable when the letter has been fully disclosed, employs "no abusive language," and contains "job-related constructive criticism." Cf. id. (denying motion to dismiss despite general rule because no disclosure of counseling letter); Baloch, 550 F.3d at 1199 (holding that "letter of counseling" and "letter of reprimand" were not materially adverse because they contained "job-related constructive criticism" without "abusive language"); Bonnette v. Shinseki, 907 F. Supp. 2d 54, 71 (D.D.C. 2012) (same).

No part of the memo can be characterized as "abusive." Instead, it included only specific job-related criticism, which "can prompt an employee to improve her performance." Baloch, 550 F.3d at 1199 (internal quotation marks and citations omitted); see also Haskins Decl., ¶ 2 ("The purpose of the counseling memo is to correct the behavior of the employee at the lowest level possible . . . .").

Further, the memorandum's standard language regarding potential disciplinary consequences up to termination does not transmute the letter into a materially adverse action. "[W]ritten warnings must typically lead to [actual] consequences," such as ineligibility for certain benefits or opportunities, "to constitute adverse employment actions." Gilliard v. Gruenberg, 302 F. Supp. 3d 257, 283 (D.D.C. 2018). While following through on the memorandum's warning "may have amounted to materially adverse action, merely advising [Plaintiff] . . . [that] [s]he might be subject to discipline does not." Id. (third alteration in original) (quoting Mahoney v. Donovan, 824 F. Supp. 2d 49, 61 (D.D.C. 2011)).

Because Moss has failed to demonstrate that the counseling memo was an adverse action, the Court need not address Defendant's alternative argument that it had a legitimate, non-retaliatory reason for its issuance.

        3.    *Desk Audit*

Moss's next claim relates to a desk audit. A Library employee typically requests a desk audit when she believes that her responsibilities go beyond those encompassed by her current position. See ECF No. 26-6 (Pl. Opp., Exh. B1), at ECF p. 34. "[B]oth managers and employees have the right to request" that Human Resources Services (HRS) perform "an audit on a position," ECF No. 26-8 (Pl. Opp., Exh. D), at ECF p. 3, and "[e]mployees are not entitled to additional compensation . . . without requesting a desk audit or an accretion of duties being performed." Friday Decl., ¶ 5.

On April 17, 2017, Moss requested that Flanagan review and sign a memorandum that she had drafted to HRS requesting "a desk audit to determine [her] eligibility for an accretion of duties promotion" based on the additional work she was performing. See Pl. Opp., Exh. E at ECF p. 5; Pl. Resp. SMF, ¶ 78. Two days later, Flanagan informed her that he would not sign the memorandum because he did not agree with Plaintiff's own assessment; however, he allowed Moss "to proceed . . . directly to HRS" with a request for a desk audit. See Pl. Resp. SMF, ¶¶ 79–81. She submitted such a request to HRS on April 19, 2017, and a classification specialist was assigned eight days later. Id., ¶ 82. HRS did not make a final determination on the request, however, because "HRS determined [Moss's] request was moot" after she was "detailed to another position effective July 1, 2017." Id., ¶ 83. Moss remained in the detail until her October 2017 promotion. Id., ¶ 103.

Plaintiff alleges that Flanagan's "failure to approve" the desk audit was discriminatory and retaliatory.  See Pl. Opp. at 27–29; see also Compl., ¶¶ 49, 57,74, 126.  Defendant argues that because "a final determination was never made" after Moss was detailed, and because she provides "no evidence" that "Flanagan interfered with the desk audit process in any way," "Plaintiff cannot show that she suffered a materially adverse action."  MSJ at 22.

The Library is correct.  Moss has put forth no evidence that Flanagan's refusal to sign had any negative impact on the desk-audit process or its result.  See Brady, 520 F.3d at 494; Brookens v. Solis, 635 F. Supp. 2d 1, 4 (D.D.C. 2009) ("[A]s a matter of law . . . denials of desk audits . . .  do not constitute adverse employment actions.").  Indeed, Moss was still allowed to proceed with her request, which moved forward with HRS until her detail rendered it moot.

She has thus likewise failed to demonstrate that this action was adverse even "under the more lenient standard" for retaliation claims.  See Brookens v. Solis, 616 F. Supp. 2d 81, 91 (D.D.C. 2009) (finding denial of desk audit did not qualify as adverse action under retaliation standard where plaintiff did not allege any resulting injury or harm); see also Burlington Northern, 548 U.S. at 67 ("[Title VII's] antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.").

The Court will thus also grant Defendant's Motion as it relates to this incident.

D.     Hostile Work Environment

Plaintiff finally argues that the Library created a hostile work environment in violation of Title VII, The Rehabilitation Act, and the ADEA.  See Compl., ¶¶ 52, 90, 94–96, 99; Pl. Opp. at 22–28.  In other words, she alleges that such environment was a product of her race, sex, disability, and age, as well as in retaliation for her EEO activity.  Although these allegations are brought under separate statutory schemes, they are analyzed under the same framework.  See

Mokhtar v. Kerry, 83 F. Supp. 3d 49, 82 (D.D.C. 2015) ("Courts apply the same analysis when evaluating a hostile work environment claim under Title VII and the ADEA."); Sanders v. Kerry, 180 F. Supp. 3d 35, 44–45 n.10 (D.D.C. 2016) (assuming that hostile-work-environment claim can be brought under Rehabilitation Act and explaining that same framework applies in evaluating "a hostile work environment claim under Title VII, the ADEA, or the Rehabilitation Act").

To prevail on a hostile-environment claim, a plaintiff must show that her employer subjected her to "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 67 (1986)).  In evaluating such a claim, the Court "looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance."  Baloch, 550 F.3d at 1201 (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787–88 (1998)).  By adhering to these standards, the Court thereby "ensure[s] that [employment-discrimination law] does not become a 'general civility code'" that involves courts in policing "'the ordinary tribulations of the workplace.'"  Faragher, 524 U.S. at 788 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998); then quoting B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 175 (1992)).

Moss argues that Defendant's conduct amounted to an "abusive working environment" that "worsened after [she] engaged in protected EEO activity."  Pl. Opp. at 24.  She bases her theory on all the actions discussed above, in addition to the following evidence, see id. at 2, 24–29:

- On March 1, 2016, Flanagan assigned Moss an overall rating of "commendable" for her performance for the rating period ending on February 28, 2017, which is the Library's second-highest rating.  Id. at 26; see also Def. Reply at 13.  This evaluation was one grade below the ratings that Plaintiff received in previous years.  See Pl. Opp. at 26; see also ECF No. 26-4 (Performance Reviews 2014-2016);

- Moss was only partially approved for two days of medical telework after she requested it from March 20-27, 2017, and was required to use unpaid leave for the unapproved days.  See ECF No. 26-12 (Plaintiff Interrogatory Responses), at 7; Pl. Resp. SMF, ¶¶ 74–77; MSJ, Exh. 1, Pt. 1 at ECF p. 5;

- On May 25, 2017, Flanagan asked Moss to make herself available for telework during her vacation the following week.  See Pl. Resp. SMF, ¶¶ 94–97; MSJ, Exh. 1, Pt. 1 at ECF p. 5;

- On June 22, 2017, McAuliffe and Deputy Director of NIO Collen Shogan assigned Moss to a 120-day detail in the National Digital Initiatives program.  See Pl. Resp. SMF, ¶ 98; and

- Moss was excluded from planning meetings and communications related to the NBF. See Pl. Opp. at 2–3; MSJ, Exh. 1, Pt. 1 at ECF p. 5.

These incidents, however, are isolated, typical workplace occurrences, and even viewed in concert and in the light most favorable to Moss, the Court finds that they fall well short of the "demanding standard[] for a hostile work environment claim" under federal law.  Baird v. Gotbaum, 662 F.3d 1246, 1251 (D.C. Cir. 2011) (quotations omitted); see, e.g., Nurriddin v. Bolden, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) (finding that "removal of important assignments, lowered performance evaluations, and close scrutiny of assignments . . . [cannot] be characterized as sufficiently intimidating or offensive in an ordinary workplace context"); Lewis v. Dist. of Columbia, 653 F. Supp. 2d 64, 81–82 (D.D.C. 2009) (finding that employer's actions, including non-selection, failure to compensate plaintiff for serving in Acting Supervisor role, and failure to respond to inquiries regarding lack of compensation, among other things, did not amount to hostile work environment); Na'im v. Rice, 577 F. Supp. 2d 361, 377 (D.D.C. 2008) (determining that low performance evaluations and non-selection fail to create hostile work

environment).  Moss has provided no evidence that the Library engaged in a pattern of behavior

that subjected her to "'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe

or pervasive to alter the conditions of [her] employment and create an abusive working

environment.'"  Baloch, 550 F.3d at 1201 (quoting Harris, 510 U.S. at 21).  Nor has she shown

that any incident was "accompanied by physical threats, abusive or offensive language[,] or any

other characteristics of 'extreme conduct.'"  Lewis, 653 F. Supp. 2d at 82 (quoting Lester v.

Natsios, 290 F. Supp. 2d 11, 31 (D.D.C. 2003)).

Put simply, the alleged affronts Moss points to do not approach the high bar for this type

of action.  No reasonable juror could find that the incidents Plaintiff cites amount to a hostile

work environment.  Judgment will thus be entered on all such claims.

## IV.    Conclusion

For the foregoing reasons, the Court will issue a contemporaneous Order granting

summary judgment on all counts.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date: July 15, 2020